**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KENNETH KRING and ELIZABETH KRING, individually and on behalf of the Jeld-Wen, Inc. 401(k) Plan and on behalf of all the similarly situated Participants and beneficiaries of the plan,<br><br>Plaintiffs,<br><br>v.<br><br>JELD-WEN HOLDING, INC.; GALLAGHER FIDUCIARY ADVISORS, LLC; THE JELD-WEN RETIREMENT BENEFITS ADMINISTRATION COMMITTEE FOR THE 401(K) SAVINGS PLAN; John and Jane Does 1-30 in their capacities as members of the Administrative Committee,<br><br>Defendants. | Case No. 25-cv-07068<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Kenneth and Elizabeth Kring ("Plaintiffs"), individually, on behalf of the JELD-WEN 401(k) Retirement Savings Plan (the "Plan"), and on behalf of other similarly situated participants and beneficiaries of the Plan, bring this action against Jeld-Wen Holding, Inc. ("Jeld-Wen"), Gallagher Fiduciary Advisors, LLC ("Gallagher"), the Jeld-Wen Retirement Benefits Administration Committee (the "Committee"), and John Does 1–30 in their capacities as members of the Committee (collectively, "Defendants") alleging various violations of the Employee Retirement Income

Security Act of 1974 ("ERISA"). Jeld-Wen and the Committee (the "Jeld-Wen Defendants") as well as Gallagher have separately moved to dismiss. [24] [26].

For the reasons stated herein, Gallagher's motion to dismiss [26] is granted and the Jeld-Wen Defendants' motion to dismiss [24] is granted in part.

## I. Background

The following factual allegations taken from the operative complaint [1] are accepted as true for the purposes of the motions to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

Jeld-Wen is a designer, producer, and distributor of interior and exterior doors, windows, and related building products. [1] ¶ 17. Jeld-Wen sponsors the Plan, which is a defined contribution retirement benefit plan. *Id.* ¶¶ 9, 18. The Committee administers the Plan. *Id.* ¶¶ 10, 21. Plaintiffs are former participants of the Plan. *Id.* ¶¶ 15–16.

The Plan allows participants to direct the investment of their accounts into one or more investment options. *Id.* ¶ 12. Among others, these options include (1) a series of T. Rowe Price target date funds ("TDFs"), (2) the Loomis Fund, and (3) the TCW Fund (together, the "Challenged Funds"). Plaintiffs contend that, since 2019, the Challenged Funds performed worse than peer funds and index benchmarks and yet were retained as investment options. *Id.* ¶¶ 44–103. Plaintiffs further maintain that the Challenged Funds carried unreasonably high costs and fees. *Id.* ¶¶ 54, 68, 113, 118, 151, 158, 174. During the relevant period, Plaintiffs were only invested in one of the Challenged Funds: the T. Rowe Price 2030 TDF. *Id.* ¶¶ 15–16.

In 2015, the Committee hired Gallagher as an investment manager of the Plan under ERISA § 3(38), 29 U.S.C. § 1002(38). *Id.* ¶¶ 35–38. According to Plaintiffs, as a 3(38) investment manager, Gallagher had "full discretionary authority to select, manage, and monitor the investment options in [the Plan]" and "assume[d] legal responsibility and fiduciary liability for the investment decisions made for the [P]lan." *Id.* ¶ 37. The Committee compensated Gallagher for its services directly from Plan assets. *Id.* ¶ 38. Plaintiffs maintain that the fees paid to Gallagher were unreasonable. *Id.* ¶¶ 186, 190.

In December 2018, an Investment Policy Statement ("IPS") laying out objectives and goals for the Plan was adopted. *Id.* ¶ 39; [25-3][1]. Plaintiffs allege that the Committee and Gallagher failed to follow the IPS. [1] ¶ 43.

On June 25, 2025, Plaintiffs filed the instant action against Defendants. [1]. Plaintiffs' Complaint alleges that, from January 1, 2019 onwards, Defendants (1) breached the fiduciary duty of prudence by failing to prudently select and retain investment options and ensure that the Plan's expenses were reasonable (Count I); (2) breached the fiduciary duty of loyalty by choosing worse investment options for the Plan to the benefit of third parties (Count II); (3) breached their co-fiduciary duties by failing to stop ongoing breaches of fiduciary duties (Count III); (4) engaged in prohibited party-in-interest fiduciary transactions (Count V); (5) engaged in fiduciary prohibited transactions (Count VI); and (6) failed to act in accordance with

[1]The Court may consider documents referred to in the Complaint and central to Plaintiffs' claims. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013).

the governing Plan documents (Count VII). *Id.* ¶¶ 192, 211–236, 244–278[2]. The Complaint further alleges that Jeld-Wen failed to monitor the Committee to ensure the Committee was adequately performing its fiduciary obligations (Count IV). *Id.* ¶¶ 237–243.

On September 8, 2025, Defendants moved to dismiss. [24] [26].

## II. Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to

[2]The Complaint inadvertently starts the paragraph numbering of Count VII at paragraph 215 instead of paragraph 264.

be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

In challenging subject-matter jurisdiction, a defendant can make a facial or factual attack. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). A factual attack on subject-matter jurisdiction occurs where a defendant contends "there is in fact no subject[-]matter jurisdiction, even if the pleadings are formally sufficient." *Id.* (internal quotations omitted). When evaluating a factual attack, "the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Id.* By contrast, a facial attack argues that the plaintiff has not alleged a basis for subject-matter jurisdiction on the face of the complaint. *Id.* The court must evaluate a facial attack by "accept[ing] all well-pleaded factual allegations as true and draw[ing] all reasonable inferences in favor of the plaintiff." *Id.*

## III. Analysis

Defendants bring several arguments in support of dismissal. Some affect the entire Complaint. Others target specific claims. The Court addresses each in turn.

**A. Standing**[3]

Defendants start by asserting that Plaintiffs lack Article III standing to pursue claims related to investment options they did not personally invest in. [27] at 7–8. To satisfy Article III standing requirements, a plaintiff must show that (1) he suffered an injury in fact, (2) the injury was likely caused by the defendant, and (3) the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, the plaintiff bears the burden of establishing these elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

On this particular question of Article III standing, the Seventh Circuit in *Albert v. Oshkosh Corp*., 47 F.4th 570, 578 (7th Cir. 2022) appears to have adopted the Third Circuit's approach in *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 131–33 (3d Cir. 2022), which found Article III standing where the class representative was invested in at least one fund affected by the allegedly improper conduct. Defendants' authorities do not contradict this rule. *Collins v. Ne. Grocery, Inc.*, 149 F.4th 163, 172 (2d Cir. 2025) (no Article III standing where the "complaint did not allege that any Plaintiff invested in *any* of these imprudent funds.") (emphasis added); *Boyette v. Montefiore Med. Ctr.*, No. 22-CV-5280 (JGK), 2023 WL 7612391, at *4 (S.D.N.Y. Nov. 13, 2023) (same). Defendants do not dispute that Plaintiffs were invested in one of the funds—the T. Rowe Price 2030 TDF—affected by the allegedly improper conduct. Plaintiffs accordingly have Article III standing to challenge other investments in

[3]Defendants also challenge Plaintiffs' standing to contest fees paid to Gallagher. The Court addresses that argument below.

which they did not personally invest but that were similarly affected by the alleged misconduct.

Defendants also argue that because Plaintiffs are *former* participants of the Plan, they have no real or immediate threat of future injury and thus lack standing to seek prospective injunctive relief. [27] at 8. "[A] plaintiff must demonstrate standing for each form of relief sought." *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 890 (7th Cir. 2013). To establish Article III standing to seek prospective injunctive relief, a plaintiff must plausibly allege that he "faces a real and immediate threat of future injury; a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019) (cleaned up).

Here, Plaintiffs no longer participate in the Plan and there are no allegations that Plaintiffs are likely to become re-employed by Jeld-Wen or participate again in the Plan. *See generally* [1]. As such, the Court agrees that Plaintiffs fail to plausibly allege that they are likely to suffer future injury if the Court does not enjoin the conduct challenged in the Complaint. *Coyer v. Univar Sols. USA Inc.*, No. 1:22 CV 0362, 2022 WL 4534791, at *4 (N.D. Ill. Sept. 28, 2022) (finding former ERISA plan participants had standing to seek retrospective relief but no standing to seek prospective injunctive relief).

The cases Plaintiffs cite in opposition are not persuasive. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009), *Cutrone v. Allstate Corp.*, No. 20 CV 6463, 2021 WL 4439415, at *6 (N.D. Ill. Sept. 28, 2021), and *Baird v. Steel Dynamics,*

*Inc.*, No. 1:23-CV-00356-CCB-SLC, 2024 WL 3983741, at *2 (N.D. Ind. Aug. 29, 2024) did not address prospective injunctive relief and the cited parts of those cases focused more on a plaintiff's statutory right under 29 U.S.C. § 1132(a)(2) to seek relief beyond her own injuries rather than sufficient Article III standing to pursue that type of relief. These are different concepts. *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 544 (2020) (explaining that the "general cause of action to sue for restoration of plan losses and other equitable relief" under 29 U.S.C. § 1132(a)(2) "does not affect the Article III standing analysis."). And while *Laurent v. PricewaterhouseCoopers LLP*, 565 F. Supp. 3d 543, 549–50 (S.D.N.Y. 2021) did address prospective injunctive relief, its analysis relies heavily on a footnote from *Amara v. CIGNA Corp.*, 775 F.3d 510, 524–25 (2d Cir. 2014), which did not substantively analyze standing at all. The Court is thus not swayed by *Laurent*.

For these reasons, Plaintiffs' claims for prospective injunctive relief are dismissed.

### B. Group and Shotgun Pleading

Defendants next argue that Plaintiffs' Complaint must be dismissed in its entirety because it repeatedly lumps various entities together as "Defendants" without specifying which conduct is attributable to which Defendant. [27] at 6–7. Defendants contend that this practice amounts to impermissible "group" and "shotgun" pleading. *Id.*

"Group pleading" refers to the "practice of collectively defining subgroups of defendants." *Fulton v. Bartik*, 547 F. Supp. 3d 799, 810 (N.D. Ill. 2021). "Shotgun pleading," by contrast, refers to the "practice of drafting a complaint in which each

count incorporates by reference all preceding paragraphs … notwithstanding that many of the facts alleged are not material to the claim." *Regan v. Adolf*, No. 24-CV-8430, 2025 WL 2604755, at *8 (N.D. Ill. Sept. 9, 2025) (internal quotations omitted). Though neither type of pleading is *per se* improper, the concern with both is fair notice under Rule 8. *SEC v. Winemaster*, 529 F. Supp. 3d 880, 907 (N.D. Ill. 2021) (shotgun pleading is not impermissible "so long as the complaint adequately puts the defendants on notice of the claims against them."); *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 955 (N.D. Ill. 2024) ("[g]roup pleading does not violate Rule 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims.") (cleaned up).

While the fair notice concerns encapsulated by "group" and "shotgun" pleading do not plague the Complaint so as to necessitate dismissal of the entire Complaint on these bases, the Court agrees with Defendants: the Complaint is confusing. As one example, the Complaint maintains that "Defendants" selected the TCW Fund in 2007, yet concedes that Gallagher was not involved before 2015. [1] ¶¶ 47, 105. As another example, Plaintiffs maintain that "each Count is asserted against every Defendant." [31] at 23. But Count IV recites only actions of Jeld-Wen. [1] ¶¶ 237–243. And Count V recites only actions of the Committee. *Id.* ¶¶ 244–253.

To be sure, the Court recognizes Plaintiffs' point that Defendants are in the best position to know who was responsible for the improper actions alleged. [31] at 5. But the way the Complaint is drafted—overreliance on incorporation by reference and the blanket grouping of Defendants even for conduct a particular Defendant was not

responsible for—is unproductive. Forcing the Court to wade through the allegations to determine which may or may not be relevant to a specific Defendant or count does not benefit Plaintiffs. The Court should not have to piece together the precise nature of Plaintiffs' allegations. The Court instead should be focusing on the merits of Plaintiffs' claims.

In sum, while the Court declines to dismiss the entire Complaint based on "group" or "shotgun" pleading, as it proceeds to address the merits, it will scrutinize Plaintiffs' allegations as they pertain to each Defendant and count.

### C. Existence of a Fiduciary Duty

A claim for breach of fiduciary duty under ERISA is valid only against a "fiduciary." *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 854 (7th Cir. 1997). "Fiduciary" status depends not on formal titles but on "functional terms of control and authority over the plan." *Burke v. Boeing Co.*, 42 F.4th 716, 725 (7th Cir. 2022) (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)). To that effect, two types of ERISA fiduciaries exist: "named" fiduciaries and "functional" fiduciaries. *Id.* Named fiduciaries are persons who are "named in the plan instrument, or who, pursuant to a procedure specified in the plan[,]" are given express "authority to control and manage the operation ... of the plan." 29 U.S.C. § 1102(a)(1)–(2). Functional fiduciaries, on the other hand, might not be named in a plan instrument but still exercise "discretionary control or authority over the plan's management, administration, or assets." *Boeing*, 42 F.4th at 725 (citing *Mertens*, 508 U.S. at 251). As part of their express authority and control to manage the plan, named fiduciaries

may designate an individual, committee, or professional plan administrator to carry out fiduciary responsibilities. 29 U.S.C. § 1105(c)(1).

It is undisputed that the Jeld-Wen Defendants are named fiduciaries. [32] at 4–9; [33] at 3–6. The Jeld-Wen Defendants, however, argue that this status does not make them liable for any breach of fiduciary duty related to the Plan's investment decisions because, during the relevant period, they were not the fiduciary responsible for such matters. [25] at 7–10. Instead, it was Gallagher who had fiduciary responsibility over the Plan's investment decisions from 2015 onwards. *Id.*

This point has merit. "In assessing whether a person can be held liable for breach of fiduciary duty, a court must ask whether that person is a fiduciary with respect to the particular activity at issue." *Plumb*, 124 F.3d at 854 (cleaned up); *see also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (the "threshold question" in every breach of fiduciary duty claim under ERISA is whether the defendant "was performing a fiduciary function ... when taking the action subject to complaint."). The Complaint asserts that the Plan is permitted to hire a Section 3(38) investment manager to "select, monitor, and manage investment options" and that Gallagher was hired in that capacity in 2015. [1] ¶¶ 37, 38. In that role, Gallagher was granted "autonomy to implement its choices" and "exercised discretionary control over the Plan and its assets," including over "the at-issue [Challenged Funds]." *Id.* Given this delegation, the Jeld-Wen Defendants cannot be said to have acted in a fiduciary capacity as to the Plan's investment decisions. *See Boeing*, 42 F.4th at 726–28 (no fiduciary duty

over investment decisions where the plan committee delegated responsibility to an investment manager).

Resisting this conclusion, Plaintiffs argue that, despite the delegation to Gallagher, it is still possible that the Jeld-Wen Defendants maintained some control over the Plan's investment decisions. [32] at 5–11. Plaintiffs' own allegations, however, foreclose this argument. In their Complaint, Plaintiffs maintain that as a Section 3(38) investment manager, Gallagher had "full discretionary authority to select, manage, and monitor the investment options"[4] and "assume[d] legal responsibility and fiduciary liability for the investment decisions made for the" Plan. [1] ¶ 37. If Gallagher had full discretionary authority and legal responsibility over investment decisions from 2015 onwards, the Jeld-Wen Defendants cannot be liable for a fiduciary breach arising from those actions.

For these reasons, Counts I and II against the Jeld-Wen Defendants, which are predicated on breaches of fiduciary duties related to investment decisions for the Plan, are dismissed.

### D. Duty of Prudence (Count I)

Count I alleges a breach of the duty of prudence. The duty of prudence requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with

[4]The parties contest whether the Court is permitted to consider the Consulting Agreement between Jeld-Wen and Gallagher, [25-2], to determine the scope of authority delegated to Gallagher. [32] at n.2; [33] at n.6. The Court need not resolve this dispute because, even without considering the Consulting Agreement, the facts as alleged by Plaintiffs support the Jeld-Wen Defendants' argument that Gallagher was given full discretionary authority over the investment options for the Plan.

such matters would use in the conduct of an enterprise of a like character and with like aims." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (citing 29 U.S.C. § 1104(a)(1)(B)). This duty includes monitoring plan investments and removing imprudent ones. *Clinton v. Baxter Int'l Inc.*, No. 25 CV 3368, 2025 WL 3470685, at *3 (N.D. Ill. Dec. 3, 2025).

Like many cases involving claims for breach of the duty of prudence, Plaintiffs provide no allegations about Defendants' actual processes for selecting and retaining investment options for the Plan. They instead ask the Court to infer that Defendants engaged in imprudent decision-making through circumstantial allegations. Such allegations can be broken down as follows: (1) the Challenged Funds underperformed, (2) the Challenged Funds had unreasonably high fees and expenses, (3) the Plan offered higher cost share classes as investment options, and (4) the investment decisions for the Plan were contrary to the IPS. The Court examines each in turn.

i. <u>Underperformance Allegations</u>

"[A] Plan's mere underperformance is not actionable so long as the fund administrators acted prudently." *Martin v. CareerBuilder, LLC*, No. 19-CV-6463, 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020); *see also Albert*, 47 F.4th at 578 ("the ultimate outcome of an investment is not proof of imprudence.") (citations omitted). For a fund's underperformance to indicate imprudence, a plaintiff must provide a "sound basis for comparison," or in other words, a "meaningful benchmark." *Albert*, 47 F.4th at 581.

Defendants argue that Plaintiffs do not identify a meaningful benchmark for any of the Challenged Funds. [25] at 10–14; [27] at 11–23. The Court agrees. Plaintiffs, for instance, allege that the TCW Fund underperformed compared to "peer" funds. [1] ¶¶ 48, 49, 52, 137. But comparing performance to unspecified "peer" funds is insufficient. There needs to be more—including facts indicating *why* such "peer" funds are suitable benchmarks. *See Clinton*, 2025 WL 3470685, at *4 ("Dismissal is warranted when the composition of the peer groups remains a mystery, such that there is no way of knowing whether the peer-group funds provide a sound basis for comparison.") (cleaned up); *see also Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1023 (9th Cir. 2025) ("[S]imply labeling funds as 'comparable' or 'a peer' is insufficient."). Putting aside conclusory allegations, Plaintiffs plead no facts suggesting that any of the funds they identify—which are primarily corporate and government funds—can serve as "sound" and "meaningful" comparators to the TCW Fund, which is primarily focused on the mortgage sector. [1] ¶ 48; *Lard v. Marmon Holdings, Inc.*, No. 1:22-CV-4332, 2023 WL 6198805, at *5 (N.D. Ill. Sept. 22, 2023) (dismissal appropriate where plaintiff failed to plead "additional qualities of the proposed comparator funds" such as "investment strategy, management style, or risk profile."). Plaintiffs' allegations that "Morningstar rated TCW a 2 out of 5 stars," [1] ¶ 138, are likewise unavailing—Plaintiffs provide no facts as to what Morningstar's analysis entailed or when the Morningstar rating was made. Without such facts, a Morningstar rating alone is not suggestive of imprudence.

For the Loomis Fund, Plaintiffs identify the Russell 1000 Growth Index as a proposed benchmark. [1] ¶¶ 61–63. Plaintiffs, however, allege no facts establishing that the Russell 1000 Growth Index is a meaningful benchmark for the Loomis Fund. To the contrary, the Complaint admits that the Russell 1000 Growth Index comprises over 450 stocks, whereas the actively managed Loomis Fund holds only "a few dozen stocks and [is] highly and unusually concentrated." *Id.* ¶¶ 61, 63–64; [25-5]. The Russell 1000 Growth Index, therefore, cannot plausibly serve as a meaningful benchmark. *See Coyer*, 2022 WL 4534791, at *6 (comparing index funds to actively managed funds is "apples-to-oranges"); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 n.4 (8th Cir. 2020) (finding that the Russell 3000 index was not a meaningful benchmark to an actively managed fund).

Finally, as to the T. Rowe Price TDFs, Defendants assert that Plaintiffs do not provide any allegations regarding the T. Rowe Price TDFs' performance from June 25, 2019 onward, let alone such performance compared to any benchmark. [27] at 13–14. Plaintiffs do not contest this point in their response brief. [31] at n.8. Any argument to the contrary is thus waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

For these reasons, Plaintiffs' allegations that the Challenged Funds underperformed do not create an inference of imprudence.

ii. Fee and Expense Allegations

"To state a claim for excessive fees, Plaintiffs are required to provide a 'meaningful benchmark' for comparison." *Dale v. NFP Corp.*, 658 F. Supp. 3d 620, 637 (N.D. Ill.

2023) (citation omitted). For the reasons explained, Plaintiffs have failed to do so. *Supra* § III.D.i. Plaintiffs' allegations that the Challenged Funds bore excessive fees and expenses, therefore, do not create an inference of imprudence.

iii. Share Class Allegations

Within a fund, there are often several different expense-ratio/revenue-sharing levels available. *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013). These are called "share classes." *Id.* Although each share class within a given fund is invested in an identical portfolio of securities, the classes have different price structures. *Id.* For example, a "retail" share class may pay the same fees as the public, whereas an "institutional" share class may pay a discounted rate. *Albert,* 47 F.4th at 574. Generally, however, lower-cost, "institutional" share classes have minimum investment thresholds. *Hughes v. Nw. Univ.*, 63 F.4th 615, 635 (7th Cir. 2023).

Plaintiffs allege that, instead of selecting the lowest cost share classes, Defendants offered higher cost share classes as investment options for the Plan[5]. [1] ¶ 151. Plaintiffs contend that this decision creates an inference of imprudence. *Id.* Defendants contest the sufficiency of these allegations. [25] at 18–19; [27] at 20–22.

To plead a breach of the duty of prudence under a share class theory, a plaintiff is required to show that "such cheaper institutional shares were plausibly available." *Hughes*, 63 F.4th at 635. There are two primary ways to do this. The first is the straightforward way: plead facts demonstrating that an ERISA plan has sufficient

[5]Plaintiffs' share class allegations go beyond the Challenged Funds, and include allegations directed at the Janus Henderson Enterprise Fund, the American Funds Income Fund, the Macquarie Large-Cap Value Equity Fund, the MFS International Diversification Fund, the Morley Stable Value Fund, and additional T. Rowe Price TDFs. [1] ¶¶ 163, 165.

assets to meet the minimum investment threshold for a given share class. *Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 828 (N.D. Ill. 2023). If such allegations are made, the natural inference is that the share class would be available to the plan.

The second way is to show that "waivers of investment minimums were possible." *Hughes*, 63 F.4th at 635. The plausibility of this waiver is a corollary of the "massive bargaining power" of the ERISA plan. *Id.* In other words, "jumbo" ERISA plans are presumed to have outsized bargaining power in the marketplace and thus, based on that power, it is reasonable to infer that such plans could negotiate waivers of investment minimums. *Id.*; *see also Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 221 (6th Cir. 2024).

Plaintiffs fail to allege a share class claim under either method. As to the first, Plaintiffs fail to allege what the minimum threshold requirements are for any share class. Without such facts, Plaintiffs' allegation that Defendants "could easily meet the minimum investment requirements," [1] ¶ 150, boils down to a conclusory assertion that does not plausibly suggest that cheaper share classes were available.

As to the second, Plaintiffs fail to allege sufficient facts suggesting that, by using Jeld-Wen's or the Plan's "size and correspondent bargaining power," less expensive share classes "were available to the Plan[]." *Hughes*, 63 F.4th at 634. At most, Plaintiffs allege that the Plan had between $332 million and $462 million in assets. [1] ¶ 13. This is certainly large. However, Plaintiffs provide no allegations linking that size to any corresponding bargaining power of the Plan. *Hughes*, 63 F.4th at 635 (finding plausible share class allegations where plaintiffs substantiated their

allegations with statements from industry experts that "jumbo"[6] retirement plans like defendant's had massive bargaining power). Plaintiffs' generic assertions that "lowest cost share classes are available to larger investors" since "institutional investors make large fund share purchases," without anything more, do not suffice. [1] ¶ 148.

Plaintiffs provide no other allegations to support a plausible inference that cheaper share classes were available. Plaintiffs' share class allegations, therefore, do not create an inference of imprudence.

iv. IPS Allegations

Lastly, Plaintiffs allege that Defendants' failure to follow the terms of the IPS creates an inference of imprudence. [1] ¶¶ 42, 45, 68, 107, 125, 136, 139. The IPS sets various objectives, guidelines, and metrics for Plan investments. [25-3] at 3–9. Yet by its own terms, the IPS explains that it is "intended to be sufficiently specific to be meaningful, yet flexible enough to be practical" and acknowledges that "exceptions" to the IPS may be "appropriate" from time to time. *Id.* at 3. To that end, the IPS outlines (1) various "goals" for the investments offered by the Plan, *id.* at 8; (2) non-exhaustive qualitative and quantitative factors to be considered when selecting an investment option for the Plan, with "no single factor determinative," *id.* at 7; (3) non-exhaustive factors to be considered when determining the ongoing suitability of an investment option, *id.* at 8; and (4) non-exhaustive criteria for removal of an investment option from the Plan. *Id.* at 9. Put differently, the IPS does not mandate

[6] According to Defendants, "jumbo" ERISA plans refer to plans with at least $1 billion in assets. [34] at 8.

the selection or removal of an investment option upon the satisfaction of any particular criterion. It instead takes a holistic approach. Plaintiffs' allegations—which cite non-compliance with selective factors or goals from the IPS—are therefore insufficient to create an inference of imprudence.

### E. Duty of Loyalty (Count II)

Count II alleges a breach of the duty of loyalty. The duty of loyalty "requires a plan fiduciary to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries,' with 'the exclusive purpose' of 'providing benefits to participants and their beneficiaries' and 'defraying reasonable expenses of administering the plan.'" *Albert*, 47 F.4th at 582 (quoting 29 U.S.C. § 1104(a)(1)(A)). To state a duty of loyalty claim, an ERISA plaintiff must do something more than simply recast his imprudence claim as a duty of loyalty claim. "[M]ost courts require something more, such as an allegation supporting an inference of self-dealing, to survive a motion to dismiss." *Martin*, 2020 WL 3578022, at *6 (collecting cases).

Plaintiffs allege that Gallagher breached the duty of loyalty by choosing inferior investment options for the Plan that had unreasonably high fees. [1] ¶¶ 220–230. But those allegations merely repackage Plaintiffs' imprudence allegations. There are no additional facts supporting an inference that Gallagher chose those investment options out of self-interest. At best, Plaintiffs point to allegations of a "kickback" scheme. [31] at 24; [32] at 16. While kickback allegations can support an inference of disloyalty, *Albert*, 47 F.4th at 583, the issue for Plaintiffs is two-fold: (1) Plaintiffs fail to support this "kickback" theory with a plausible set of non-conclusory allegations,

and (2) any such "kickback" scheme would be self-dealing by Jeld-Wen, not Gallagher.[7]

Without any facts supporting an inference that Gallagher acted out of self-interest, the duty of loyalty claim against Gallagher fails. And because the Jeld-Wen Defendants owe no fiduciary duties with respect to the investment options for the Plan, the duty of loyalty claim against them likewise fails. *Supra* § III.C. Count II is therefore dismissed.

### F. Co-Fiduciary Duties (Count III)

In Count III, Plaintiffs allege that, pursuant to 29 U.S.C. § 1105(a), each Defendant is liable for breaches of its co-fiduciaries. [1] ¶¶ 231–236. ERISA fiduciaries can be held responsible for the breaches of other fiduciaries under some circumstances. To state a claim for co-fiduciary liability, a plaintiff must plausibly allege that a fiduciary "(1) participated knowingly in, or undertook knowingly to conceal, an act or omission that he knows is a breach; (2) failed to follow his fiduciary duties, thereby enabling another fiduciary to commit a breach; or (3) had knowledge of the breach committed by another fiduciary and made no reasonable efforts to remedy that breach." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, No. 18-CV-1861-WCG, 2022 WL 4088166, at *8 (E.D. Wis. Mar. 17, 2022) (citing 29 U.S.C. § 1105(a)(1)–(3)).

[7]As the Court understands it, Plaintiffs' "kickback" theory asserts that the Challenged Funds' managers sent payments to Jeld-Wen in exchange for selecting funds with higher fees in the Plan. *See* [1] ¶¶ 174, 175. Plaintiffs fail to allege facts that plausibly establish that Gallagher received any part of these "kickbacks."

Gallagher maintains that the co-fiduciary claim against it fails because Plaintiffs provide no facts indicating that it had actual knowledge of any of the Jeld-Wen Defendants' alleged fiduciary breaches. [27] at 25. The Court agrees. "It is well-established that actual knowledge by a fiduciary is required in order for co-fiduciary liability to attach under § 405(a)." *Keach v. United States Tr. Co.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002) (citation omitted). The Complaint contains no allegations that Gallagher had actual knowledge of any fiduciary breach by the Jeld-Wen Defendants. Nor could it: the Jeld-Wen Defendants were not fiduciaries with respect to the investment decisions underlying Plaintiffs' fiduciary duty claims, *supra* § III.C, so there were no fiduciary breaches for Gallagher to know about. *See Appvion*, 2022 WL 4088166, at *8 ("Where a plaintiff fails to allege an underlying fiduciary breach, a claim for co-fiduciary liability will necessarily fail.").

The Jeld-Wen Defendants, for their part, argue that, under 29 U.S.C. § 1105(d)(1), Gallagher's status as an appointed ERISA § 3(38) investment manager precludes co-fiduciary liability against them. [25] at 16. ERISA provides that, where an investment manager is appointed, a "trustee shall [not] be liable for the acts or omissions of such investment manager or managers." 29 U.S.C. § 1105(d)(1). While this language uses the term "trustee"—a distinct subset of fiduciaries—courts have explained that the protection of § 1105(d)(1) extends to all named fiduciaries. *Lauderdale v. NFP Ret., Inc.*, No. SACV21301JVSKESX, 2022 WL 422831, at *7 (C.D. Cal. Feb. 8, 2022); *Harris Tr. & Sav. Bank v. Salomon Bros.*, 832 F. Supp. 1169, 1178 (N.D. Ill. 1993). But by its own terms, 29 U.S.C. § 1105(d)(1) applies only to co-fiduciary liability under

§§ 1105(a)(2) and (a)(3) and does not preclude co-fiduciary liability under § 1105(a)(1). Given this, Plaintiffs argue that § 1105(a)(1) liability attaches here, maintaining that the Complaint alleges that the Jeld-Wen Defendants knowingly participated in Gallagher's breach. [32] at 12. But as the Jeld-Wen Defendants correctly point out, the Complaint contains no such allegations. The only two references in the Complaint to any variation of "known" or "knowingly" are that the Jeld-Wen Defendants "should have known" the T. Rowe Price 2030 fund "would not perform well in the future" and that the Committee "knew or should have known" that less expensive share classes were available. [1] ¶¶ 85, 175. Neither allegation speaks to the Jeld-Wen Defendants' actual knowledge of fiduciary breaches by Gallagher, let alone allegations that the Jeld-Wen Defendants "knowingly" "participate[d]" in or "conceal[ed]" Gallagher's breaches. 29 U.S.C. § 1105(a)(1).

For these reasons, Count III is dismissed.

### G. Failure to Monitor (Count IV)

In Count IV, Plaintiffs allege that Jeld-Wen[8] failed to monitor the performance of the Committee to ensure that they were adequately performing their fiduciary obligations with respect to the Plan's investments. [1] ¶¶ 237–243. "Individuals who appoint ERISA fiduciaries have a duty to monitor those fiduciaries' actions and to provide them with the information necessary to carry out their responsibilities." *Bartnett v. Abbott Lab'ys*, No. 20-CV-02127, 2021 WL 428820, at *5 (N.D. Ill. Feb. 8,

[8]Jeld-Wen's failure to monitor the Committee—and not any failure to monitor Gallagher—is the only specific conduct alleged in Count IV. [1] ¶¶ 237–243. The Court, therefore, will evaluate Count IV only with respect to this allegation.

2021) (quoting *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 867 (N.D. Ill. 2009)). This duty requires, according to the Department of Labor, reviewing "the performance of trustees and other fiduciaries" at "reasonable intervals" and "in such [a] manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and the statutory standards, and satisfied the needs of the plan." *Id.* (quoting 29 C.F.R. § 2509.75–8 at FR–17 (Department of Labor questions and answers)).

The issues with Count IV are the same as with Counts I and II. Because it was Gallagher who was responsible for making investment decisions during the relevant period, it is a duty to monitor Gallagher, not the Committee, which would presumably matter. Plaintiffs, however, plead no facts in Count IV demonstrating any failure to adequately monitor Gallagher. [1] ¶¶ 237–243. Count IV is therefore dismissed.

### H. Prohibited Transactions with a Party in Interest (Count V)

In Count V, Plaintiffs allege that the Committee[9] engaged in certain prohibited transactions in violation of 29 U.S.C. § 1106(a). [1] ¶¶ 244–253. ERISA forbids a fiduciary from causing a plan to engage in certain "transactions" between the plan and a "party in interest." 29 U.S.C. § 1106(a). Plaintiffs point to three "transactions" that they contend trigger 29 U.S.C. § 1106(a) liability: (1) the fees paid to Gallagher, (2) the inclusion and retention of the Challenged Funds in the Plan, and (3) the

---

[9]The Committee is the only specific Defendant alleged to have engaged in prohibited transactions in Count V. [1] ¶¶ 244–253. For the reasons already explained, the Court will evaluate Count V only with respect to the Committee's alleged actions.

payment of fees to managers of the Challenged Funds. *Id.*; [31] at 23–24; [32] at 14–16. The Court addresses each in turn.

i. Payments to Gallagher

Plaintiffs first allege that the Committee (a "fiduciary") paid Gallagher (a "party in interest") unreasonably high investment fees out of Plan assets in violation of 29 U.S.C. § 1106(a). [32] at 12–14; [1] ¶¶ 250–251. As an initial matter, these "transactions" were performed by the Committee, not Gallagher. [1] ¶¶ 250–251. Gallagher, therefore, cannot be held liable for them. *See* 29 U.S.C. § 1106(a)(1) ("A fiduciary with respect to a plan *shall not cause* the plan to engage in a transaction …") (emphasis added).

Though the Committee caused these payments, Defendants argue that Plaintiffs lack Article III standing to challenge these "transactions" because Plaintiffs do not allege that they personally paid these fees. [25] at 19. Therefore, Defendants contend, Plaintiffs never suffered an injury. This argument misconstrues the Complaint. Plaintiffs do not allege injuries stemming from their direct payment of fees to Gallagher. They instead allege that the Committee compensated Gallagher through Plan assets. [1] ¶ 38. When such fees are taken from the Plan, it is reasonable to infer that all Plan participants, including Plaintiffs, were injured. Plaintiffs' allegations, therefore, are sufficient to establish standing. *Albert*, 47 F.4th at 577–78 (recognizing standing to recover fees affecting all participants in an ERISA plan, such as excessive investment-advisor fees).

Defendants nevertheless push back on this theory, maintaining that injuries to a plan are not the same as injuries to plan participants. [33] at 12. Defendants rely heavily on the Supreme Court's decision in *Thole* to support this argument. *Id.* The Seventh Circuit has explained, however, that *Thole* "does not shed much light on standing for participants in defined contribution plans." *Albert*, 47 F.4th at 578 n.4. This is because *Thole* involved a defined benefit plan (*e.g.*, a pension plan) where the participants "receive a fixed amount of money per month, no matter how the plan itself is managed." *Id.* In other words, unlike defined contribution plans, where fees can affect "the ultimate amount of money received by the beneficiaries … [t]he benefits paid to the participants in a defined-benefit plan are not tied to the value of the plan." *Thole*, 590 U.S. at 543. "[T]he difference between defined contribution plans and defined benefit plans was of decisive importance to the Article III analysis." *Albert*, 47 F.4th at 578 n.4 (internal quotations omitted). Because the Plan here is a defined contribution plan, [1] ¶ 9, the logic of *Thole* does not control. And for similar reasons, Defendants' reliance on *Cox v. Blue Cross Blue Shield of Michigan*, 216 F. Supp. 3d 820 (E.D. Mich. 2016), which involved an ERISA healthcare plan, is not persuasive.

Defendants' remaining authority in support of their argument is similarly unconvincing. In *Guyes v. Nestle USA, Inc.*, No. 20-CV-1560-WCG-SCD, 2022 WL 18106384 (E.D. Wis. Nov. 21, 2022) and *Lange v. Infinity Healthcare Physicians, S.C.*, No. 20-CV-737-JDP, 2021 WL 3022117 (W.D. Wis. July 16, 2021), for instance, the key fact was that the defendants provided evidence demonstrating that the plaintiffs

actually never invested in the fund or service that actually paid the contested fees. And equally, in *Collins*, the plaintiffs never alleged that they invested in the specific funds that were mismanaged. 149 F.4th at 174. By contrast, the allegations here are that Gallagher was paid from Plan assets, [1] ¶ 38. In view of this—and given that Gallagher was responsible for all investment decisions across all Plan assets, including the Challenged Funds—it is reasonable to infer that Gallagher's fees were derived from assets in the Plan that the Plaintiffs were personally invested in. Of course, information developed later in the case could very well reveal the opposite. But that is an issue for discovery.

Aside from standing, Defendants provide no other basis for dismissal of these transactions. [25] at 19–22. Accordingly, Count V survives with respect to payments from the Committee to Gallagher.

ii. <u>Inclusion and Retention of the Challenged Funds in the Plan</u>

Plaintiffs also allege that the Committee's (a "fiduciary") inclusion and retention of the Challenged Funds in the Plan violated 29 U.S.C. § 1106(a). [1] ¶ 249. As the Court understands the theory, because the Challenged Funds carried excessive management fees and expenses, the selection of those funds for inclusion in the Plan—and subsequent retention of those funds in the Plan—caused the Plan to pay those fees to the managers (a "party in interest") of the Challenged Funds (*i.e.*, Loomis, T. Rowe Price, and TCW).

Defendants attack this theory on multiple fronts. They first contend that retention of funds in a plan does not qualify as a "transaction" under 29 U.S.C. § 1106(a). The

Court agrees. Various courts have held that "a decision to continue certain investments, or a defendant's failure to act, cannot constitute a 'transaction' for purposes of [Section 1106(a) or 1106(b)]." *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013) (collecting cases); *see also Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 348 (S.D.N.Y. 2024) ("the retention of affiliated funds in the Plan lineup does not qualify as a 'transaction' under Section 1106."). This is because a "transaction" connotes an affirmative action. *Alphin*, 704 F.3d at 340. The Court sees no persuasive reason here to depart from this logic.

As to the initial "inclusion of" the Challenged Funds in the Plan, Defendants argue that ERISA's statute of repose bars most of this theory. They are correct. ERISA has a six-year statute of repose. 29 U.S.C. § 1113(1). The Complaint alleges that the T. Rowe Price TDFs and the TCW Fund were added to the Plan in 2007. [1] ¶¶ 47, 82. This date is outside the six-year window. The Committee, therefore, cannot be liable under 29 U.S.C. § 1106(a) for the "inclusion of" those funds in the Plan. That leaves the Loomis Fund, which was added to the Plan in 2020. [1] ¶ 60. While this date falls within ERISA's statute of repose, it was Gallagher—not the Committee—who made investment decisions for the Plan at that time. *Id.* ¶¶ 35–38. As such, it is not plausible that the Committee "cause[d]" the Plan to add the Loomis Fund as an investment option. 29 U.S.C. § 1106(a).

For these reasons, Count V against the Committee for the inclusion and retention of the Challenged Funds in the Plan is dismissed.

iii. Payment of Fees to Managers of the Challenged Funds

Plaintiffs lastly allege that the Committee (a "fiduciary") paid excessive fees to the managers (a "party in interest") of the Challenged Funds in violation of 29 U.S.C. § 1106(a). [1] ¶¶ 250–251; [33] at 14–15. At the outset, the Court struggles to distinguish this theory from the preceding one. As the Court understands the mechanics, once a fund is added to and retained in the Plan, the manager's fees are collected automatically under the fund's payment terms. That is, there is no separate "transaction" to effect those payments. However, to the extent Plaintiffs are alleging that the Committee made separate, affirmative payments to the managers of the Challenged Funds—and that such payments are "transactions" for purposes of 29 U.S.C. § 1106(a)—that theory too fails. From 2015 onward, it was Gallagher, not the Committee, who managed and monitored the investments for the Plan. [1] ¶¶ 35–38. Given this and putting aside conclusory allegations, the Court finds no plausible set of factual allegations suggesting that it was the Committee, and not Gallagher, who "caused" the payments of fees to managers of the Challenged Funds in the Plan.

For these reasons, Count V against the Committee for payment of fees to the managers of the Challenged Funds in the Plan is dismissed.

### I. Prohibited Transactions with a Fiduciary (Count VI)

In Count VI, Plaintiffs allege that Defendants engaged in prohibited transactions between the Plan and a fiduciary in violation of 29 U.S.C. § 1106(b). [1] ¶¶ 254–263. Unlike Count V, Plaintiffs point only to the inclusion and retention of the Challenged Funds in the Plan as a basis for 29 U.S.C. § 1106(b) liability. *Id.*

The same issues with Count V plague Count VI: retention of funds does not qualify as a "transaction" and ERISA's statute of repose bars any claim based on the initial selection of the T. Rowe Price TDFs and the TCW Fund. This again leaves the Loomis Fund, which was added to the Plan in 2020 by Gallagher. [1] ¶¶ 35–38, 60. There are no plausible allegations, however, that Gallagher selected the Loomis Fund for its own interest or on behalf of a party whose interests are adverse to the interests of the Plan. 29 U.S.C. § 1106(b)(1)–(2). At best, Plaintiffs point to the aforementioned "kickback" scheme, in which "Defendants … acquired valuable consideration as a result of the investment options recommended, selected, and retained in the Plan." [1] ¶ 258. While such arrangements have been found to support a 29 U.S.C. § 1106(b)(3) claim, *see e.g.*, *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156, 171 (D. Conn. 2006), Plaintiffs fail to support this "kickback" theory with a plausible set of factual allegations. *Supra* § III.E.

For these reasons, Count VI is dismissed.

### J. Failure to Follow the IPS (Count VII)

In Count VII, Plaintiffs allege that Defendants violated 29 U.S.C. § 1104(a)(1)(D) by failing to follow the IPS. ERISA requires fiduciaries to "discharge their duties … in accordance with the documents and instruments governing the plan." *Su v. Johnson*, 68 F.4th 345, 352 (7th Cir. 2023) (citing 29 U.S.C. § 1104(a)(1)(D)). The rule aims to ensure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Young v.*

*Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 894 (N.D. Ill. 2009) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)).

As a threshold matter, it is unclear whether the IPS is a "document[] or instrument[] governing the Plan" within the meaning of 29 U.S.C. § 1104(a)(1)(D). Plaintiffs say it is. [31] at 9–10. Defendants say it is not. [27] at n.9. And while both sides cite cases in support of their positions, no party has provided any Seventh Circuit authority on the question. The Court, though, need not address this issue because even if the IPS fell under 29 U.S.C. § 1104(a)(1)(D), Count VII would still fail.

The dispositive issue with Count VII is that the provisions of the IPS that Plaintiffs claim Defendants violated do not actually appear in the IPS. [27] at 10. Plaintiffs concede this point, explaining that the provisions come from another document and were included by mistake.[10] [31] at n.4. Whatever obligations that other document may impose, Defendants cannot be in violation of 29 U.S.C. § 1104(a)(1)(D) for failing to follow provisions that the IPS does not contain.

For these reasons, Count VII is dismissed.

## IV. Conclusion

For the stated reasons, Gallagher's motion to dismiss [26] is granted and the Jeld-Wen Defendants' motion to dismiss [24] is granted in part. All claims are dismissed

[10]Recognizing this error, Plaintiffs assert that other parts of the Complaint recite provisions that appear in the IPS. [31] at 10–11. But it is not the Court's or Defendants' job to scour the Complaint to determine which specific allegations support which count. Instead, it is Plaintiffs' job to put Defendants on notice of the provisions of the IPS they are relying on to support their § 1104(a)(1)(D) claim so that Defendants can properly respond. Plaintiffs have not done so.

without prejudice aside from Plaintiffs' 29 U.S.C. § 1106(a) claim (Count V) seeking retrospective relief based on payments made to Gallagher. The Court will allow Plaintiffs to file an amended complaint if they strictly comply with this order and cure the deficiencies discussed. Further, if Plaintiffs choose to amend, they are required to clarify which Defendant is being sued in each count. The First Amended Complaint, if any, is due on or before September 14, 2026.

E N T E R:

Dated: August 21, 2026

Mary M Rowland

MARY M. ROWLAND
United States District Judge